| | |
|---|---|
| JPM RESTAURANT, LLC, | ) |
| *Plaintiff*, | ) ) ) No. 1:24-cv-357 |
| v. | ) ) Judge Curtis L. Collier |
| UNITED STATES OF AMERICA, | ) Magistrate Judge Michael J. Dumitru ) |
| *Defendant*. | ) |

**M E M O R A N D U M**

Before the Court is a motion for summary judgment by the United States of America (the "Government") (Doc. 51). JPM Restaurant has responded (Doc. 54) and the Government has replied (Doc. 56).

**I.  BACKGROUND**

    **A.  Statutory Background**

        **1.  The ERC**

In 2020, Congress passed, and the President signed into law, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), an economic stimulus bill designed to respond to the COVID-19 pandemic's impact on the economy, businesses, localities, and individuals. Pub. L. No. 116-136, 134 Stat. 281 (2020). The Act contained several emergency economic relief provisions to aid small businesses, one of which was the Employee Retention Credit ("ERC"). *Id.* § 2301, 134 Stat. 281, 347-51 (codified, as amended, at 26 U.S.C. §§ 3134 *et seq*). The ERC is a "refundable tax credit that subsidized employers who were forced to close or suspend operations due to COVID-19-related public health orders." *Gravenstein 116, LLC v. United States*, No. 25-997, 2026 U.S. Claims LEXIS 48, at *3 (Fed. Cl. Jan. 30, 2026) (footnote omitted).

The ERC "is a presumption-out" statute, meaning that "everyone starts outside of eligibility for the stated relief, and claimants must show why they fit within and satisfy applicable statutory definitions to get 'in' and qualify for the relief." *In re JSmith Civil, LLC*, 674 B.R. 207, 213 (Bankr. E.D.N.C. 2025). The ERC was available to eligible businesses for the last three calendar quarters of 2020 and the first three calendar quarters of 2021. § 2301, 134 Stat. at 347-51; 26 U.S.C. 3134(a). Employers can reduce the amount paid in unemployment taxes with ERC credits. § 2301(a), 134 Stat. at 347. An eligible employer is one:

> (i) which was carrying on a trade or business during calendar year 2020, and
> (ii) with respect to any calendar quarter, for which—
> (I) the operation of the trade or business described in clause (i) is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID–19)."[1]

Pub. L. No. 116-136, 134 Stat. 281 (2020), § 2301(c)(2)(A). The statute does not define a partial or full suspension, nor does it define what constitutes an order from an appropriate government authority.

In addition to showing that an employer is eligible, the employer must substantiate the amount of qualifying wages. For the last three quarters of 2020, the credit allowed is equal to 50% of qualified wages, and for the first three quarters of 2021, it is equal to 70% of qualified wages. *See* Pub. L. No. 116-136 § 2301(a), Pub. L. 116-260; 134 Stat. 1182 § 207(b), 26 U.S.C. § 3134(a).

---

[1] In the alternative, an employer may be eligible by showing a decline in gross receipts for the quarter as compared with the same quarter in 2019. § 2301(c)(2)(B). But JPM is not claiming eligibility under this test. (*See* Doc. 1 ¶ 15).

## 2. The Tennessee Pledge

The Tennessee Pledge was "guidance for business and other activities during the COVID-19 pandemic to help Tennesseans get back to work and play in a safe environment and reboot livelihoods and the economy." (Doc. 52-8 at 1.) It was developed by the Tennessee Economic Recovery Group and was based on recommendations from the Centers for Disease Control and Prevention ("CDC"), Occupational Safety and Health Administration ("OSHA"), and Tennessee Department of Health. (*Id.* at 2.) On April 28, 2021, the Governor of Tennessee issued Executive Order 80, which stated that the Tennessee pledge "should no longer be considered an independent source of information or recommendations." (Doc. 52-10 at 1.)

## B. Factual Background[2]

JPM Restaurant, LLC is a neighborhood restaurant and bar in Chattanooga. (Doc. 52-7 at 5.) During the COVID-19 pandemic, state, federal, and local governments responded by issuing a variety of restrictions, recommendations, and orders to slow the spread of the disease. According to JPM,

> [D]uring the COVID-19 pandemic, Plaintiff was compelled to suspend and/or modify a more than normal portion of its business due to compliance with State, Local[,] or Federal government-issued orders limiting commerce, travel, or group meetings, including (but not limited to) substantially increasing processing and check-in times for employees due to mandated social distancing, temperature checks and sanitation, being unable to meet with prospective employees due to social distancing and indoor occupancy restrictions, limitations on customer capacity, and other restrictions imposed by State and Local government which resulted in a reduction in gross receipts sought to be alleviated by the ERC program.

---

[2] Factual disputes and reasonable inferences regarding the underlying facts are presented in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

3

(Doc. 1 ¶ 14.) JPM believed it was eligible for ERCs for quarters two through four of 2020 and one through three of 2021 and claimed ERC-related refunds totaling $338,132.56. (*Id.* ¶ 15.) The IRS did not issue JPM any refunds for the ERC Refund Claims. (*Id.* ¶ 16.) Because it had been at least six months since the date of the filing, JPM filed suit on November 11, 2024, under 26 U.S.C. §§ 7422 and 6532, which provide for the recovery of taxes paid under Title 26 of the United States Code.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing whether summary judgment is warranted, courts must "draw all reasonable inferences in favor of the nonmoving party." *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 316 (6th Cir. 2014). In doing so, the court should consider "the plethora of material available in the record" to determine whether the moving party is entitled to judgment as a matter of law, including "pleadings, depositions, answers to interrogatories, written admissions, transcripts of evidence, and written stipulations of fact." *Doe v. Univ. of Ky.*, 111 F.4th 705, 715 (6th Cir. 2024).

The court should consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986). Indeed, a "[plaintiff] is not entitled to a trial on the basis of mere allegations." *Smith v. City of Chattanooga*, No. 1:08-cv-63, 2009 WL 3762961, at *2–3 (E.D. Tenn. Nov. 4, 2009) (explaining the court must determine whether "the record contains sufficient facts and admissible evidence from which a rational jury could reasonably find in favor of [the] plaintiff").

While the movant bears the burden of establishing that there is no genuine dispute of material fact, "she can meet that standard by showing that the non-moving party lacks evidence to support an essential element of her case." *Randle v. Lewis,* No. 24-1888, 2025 U.S. App. LEXIS 10728 (6th Cir. May 1, 2025). Under Rule 56(c)(1)(B) of the Federal Rules of Civil Procedure, a party asserting that a fact cannot be or is genuinely disputed must support the assertion by showing "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). However, "a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332 (1986). A movant can challenge the nonmovant "'to put up or shut up on a critical issue,' and if it does 'not put up, summary judgment [is] proper.'" *Lansky v. Prot. One Alarm Monitoring, Inc.*, No. 17-2883, 2019 U.S. Dist. LEXIS 22275, at *4 (W.D. Tenn. Feb. 12, 2019) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)) (alteration in original).

### III. <u>DISCUSSION</u>

The Government argues JPM is not an eligible employer because it did not experience a full or partial suspension of operations due to a government order for any period other than the initial lockdown from March 23, 2020, to April 26, 2020. (Doc. 52 at 27.) As to the initial lockdown, the Government "does not dispute that JPM experienced a partial suspension of operations from March 23, 2020, until April 26, 2020." (*Id.* at 10). But the Government argues JPM has failed to substantiate the amount of qualifying wages paid during that suspension. (Doc. 52 at 11.) The Court will first define the statutory terms "order," "full or partial suspension," and

5

"due to," which are necessary to determine whether JPM was, as a matter of law, not an eligible employer. The Court will then address each argument in turn.

## A. Section 2301(c)(2)(A)

This case turns on whether JPM was an eligible employer. An eligible employer is one for whom, during the quarter the credit is sought, their business was "fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)." § 2301(c)(2)(A). The statute does not define "full or partial suspension," nor does it define an "order" from an appropriate governmental authority. The Internal Revenue Service ("IRS") did develop and publish guidance interpreting this statute. (*See* Doc. 52-1). Of course, following the Supreme Court's decision in *Loper Bright Enters. v. Raimondo*, courts "need not and under the [Administrative Procedures Act] may not defer to an agency interpretation of the law simply because a statute is ambiguous." 603 U.S. 369, 413 (2024); *see also Coahoma Cmty. Coll. v. United States*, No. 4:24-cv-124-DMB-DAS, 2025 U.S. Dist. LEXIS 265017 (N.D. Miss. Dec. 23, 2025) (finding that in a tax refund suit about the statutory terms governing ERC-eligibility, the meaning of the statute's terms is a "question of statutory interpretation entrusted to the court," and "that interpretive task is conducted *de novo*"). But courts may still consider agency guidance depending on the "thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Loper Bright*, 603 U.S. at 388 (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944)). Therefore, the Court must perform the interpretive task de novo.

6

Both JPM and the Government consistently reference a "Suspension Test," which does purport to define some terms. The Government defines the Suspension Test as follows:

> (1) a mandatory government order, rather than a recommendation, must limit commerce, travel, or group meetings, (2) a non-de minimis portion of the business's operations must be stopped or closed, whether in part or in full, and (3) that mandatory government order must be a direct and proximate cause of the stoppage.

(Doc. 52 at 12.) But neither party provides authority for such test. The Government cites Section 2301(c)(2)(A) of the CARES Act for the test, but the Government's language is different from the language of Section 2301(c)(2)(A), which states that:

> An eligible employer is one:
>
>> (i) which was carrying on a trade or business during calendar year 2020, and
>> (ii) with respect to any calendar quarter, for which—
>>> (I) the operation of the trade or business described in clause (i) is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID–19)."[3]

Pub. L. No. 116-136, 134 Stat. 281 (2020), § 2301(c)(2)(A). Therefore, the Court will use the language in the statute as the test to determine whether JPM was eligible for a refund rather than using this interpretation. The Court must then define order, suspension, and "due to" and determine whether there is a genuine issue of material fact as to whether JPM had its operations suspended due to an order or orders from an appropriate governmental authority. The Court also notes that it is only aware of one other federal court that has defined these terms in this statute. *See In re JSmith Civil, LLC*, 674 B.R. 207, 213 (Bankr. E.D.N.C. 2025).

---

[3] In the alternative, an employer may be eligible by showing a decline in gross receipts for the quarter as compared with the same quarter in 2019. § 2301(c)(2)(B). But JPM is not claiming eligibility under this test. (*See* Doc. 1 ¶ 15).

7

1. **Order**

When interpreting an undefined term in a statute, courts generally construe that term "according to its 'ordinary, contemporary, common meaning.'" *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) (quoting *Sandifer v. United States Steel Corp.*, 571 U.S. 220, 227 (2014)).

An order is a "command, direction, or instruction." *In re JSmith Civil, LLC,* 674 B.R. 207, 214 (Bankr. E.D.N.C. 2025) (quoting Order, Black's Law Dictionary (12th ed. 2024)). A command and an instruction are at different points on the spectrum of how mandatory the order must be. But the Court finds that to qualify as an order, the directive must be compulsory. This is in line with how other courts have defined this term. *See in re JSmith Civil, LLC,* 674 B.R. 207, 214 (Bank. E.D.N.C. 2025); *Baxter Senior Living, LLC v. Zurich Am. Ins. Co.*, No. 3:22-cv-00044-SLG, 2025 WL 1207151, at *6 (D. Alaska April 25, 2025) (finding that, in a case about COVID-19 operating restrictions, to qualify as a government order for insurance purposes, the directive must have been compulsory). And this effectuates Congress's intent in creating a presumption-out statute in which employers must demonstrate their eligibility.

2. **Suspension**

The statute also does not define a "full or partial suspension." A "suspension" is "'[t]he act of temporarily delaying, interrupting, or terminating something,' or '[t]he state of such delay, interruption, or termination.'" *In re JSmith*, 672 B.R. at 214 (quoting *Suspension, Black's Law Dictionary* (12th ed. 2024)) (alterations in original). The plain meaning of "full" is "complete especially in detail, number, or duration." *Full,* Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/full (last visited Feb. 24, 2026). The plain meaning of partial is "of or relating to part rather than the whole: not general or total." *Partial*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/partial (last visited Feb.

24, 2026). Therefore, taken together, a "full suspension" is a complete delay or interruption in operations, while a "partial suspension" is a suspension of at least some, but less than all operations. This would require a restaurant to shut down or close either completely or partially (such as reducing hours, shutting down one or multiple areas of the restaurant, or reducing services offered).

### 3. Due to

The Government argues that the phrase "due to" requires a "direct and proximate causation requirement." (Doc. 52 at 16.) In advocating for this interpretation, the Government argues that because Congress included traditional eligibility criteria, there was a "plain intention to confine the pool of potential beneficiaries to a particular class," and "[a] direct and proximate cause standard best effectuates this intent." (*Id.*) In response, JPM argues that "[t]he ERC is a remedial tax credit administered under IRS guidance, and Notice 2021-20 frames the inquiry as whether an employer's operations are suspended because of an order, not whether the employer can satisfy a negligence-style proximate cause test." (Doc. 54 at 6.)

"Due to" typically means "because of." *See In re JSmith*, 674 B.R. at 215 (interpreting "due to" in section 2301(c)(2)(A) to mean "because of"). Here, the Court agrees that due to the ERC being a presumption-out statute, *see id.*, the intent of Congress was to limit eligibility rather than paint with a broad brush. Lengthy causal chains that could arise from a but-for test without a proximate causation requirement would risk turning the ERC into a presumption-in statute. And given the compulsory nature of a government order that must have caused the shutdown, the Court finds that read in context, Congress was intending to offer relief to those who were directly affected by government orders rather than offering broad relief to anyone indirectly affected by the pandemic. There are other provisions in the CARES Act that offered such broader relief, such as

9

stimulus checks. Pub. L. 116-136, 134 Stat. 281 (2020). The breadth of other relief available in the same Act suggests that Congress did not intend the ERC to provide the same expansive relief that could arise from a mere factual causation requirement. Therefore, the Court finds that "due to" requires both factual and proximate causation—meaning that the order must have been the "but-for" cause and a foreseeable cause of the full or partial shutdown.

Having defined these terms, the Court now turns to whether JPM experienced a full or partial shutdown of operations due to a government order during the requisite time periods.

### B. March 23, 2020, until April 26, 2020

The Government concedes that JPM experienced a suspension of operations during the "initial lockdown" from March 23, 2020, to April 26, 2020. (Doc. 52 at 27.) The Government, in its motion for summary judgment, argues that JPM has not "substantiated *any* of the claimed refund quarters," and therefore, "has not yet proven an element of its refund claim." (*Id.* at 27.) But the Government does not, in the substance of its motion for summary judgment, seek summary judgment on the issue or argue affirmatively that there is a lack of evidence on this point; it only notes that JPM has not yet substantiated its claims. (*Id.*) In fact, the Government recommends that,

> If the Court agrees with the United States that JPM is only entitled to an ERC for the initial shutdown running from March 23, 2020 to April 26, 2020, the United States recommends that substantiation of the partial quarter two 2020 credit be determined through court-ordered briefing rather than via a bench trial. In that event, JPM should be required to submit its calculation and evidence substantiating its qualified wages, allowing the United States to respond in support or opposition.

*Id.* at 28. While the Government introduces its motion by stating it seeks summary judgment on all claims, (*id.* at 6), it acknowledges in its brief that there is a genuine dispute of material fact as to the refund amount that it itself suggests should be resolved litigation. In fact, the Government

10

says that such substantiation could be shown "through court ordered briefing." *Id.* at 28. Such an assertion does not meet its burden as the movant to require Plaintiff to present admissible evidence on these damages or risk judgment against it. *See J.C. Bradford & Co.*, at 1478 (allowing a "put up or shut up" motion). Rather, it amounts to the Government admitting that there is a genuine issue of fact as to the amount of substantiation and agreeing that such substantiation can still be established. Therefore, the Court finds that the Government did not move for summary judgment as to the substantiation of the refund amount for the period between March 23, 2020, and April 26, 2020.

In response to the Government's acknowledgement of genuine fact disputes and its offer for further litigation on this topic, JPM did not put forth evidence of substantiation. Then, in its reply, the Government changed its position on the likely continued litigation of the damages issue. It instead argued that "[b]ecause JPM has submitted no evidence whatsoever, let alone evidence sufficient to substantiate its claimed refund amount, it has failed to rebut the United States' Motion." (Doc. 56 at 18.) While the Government's argument in its reply brief amounts to a "put up or shut up" motion, the Local Rules of the Eastern District of Tennessee require that if a reply brief is filed, it shall "directly reply to the points and authorities contained in the answering brief." E.D. Tenn. L.R. 7.1(c). "It is well-settled that a movant cannot raise new issues for the first time in a reply brief because consideration of such issues 'deprives the non-moving party of its opportunity to address the new arguments.'" *Malin v. JPMorgan*, 860 F. Supp. 2d 574, 577 (E.D. Tenn. 2012) (quoting *Cooper v. Shelby Cnty.*, No. 07-2283-STA-cgc, 2010 U.S. Dist. LEXIS 81198, at *3 n.14 (W.D. Tenn. Aug. 10, 2010)). Because the Government conceded both liability and that there was a disputed issue as to the amount of the refund that could be resolved by further briefing, JPM did not have a reason to put forth its substantiation evidence in its response brief.

11

Seeking summary judgment on the substantiation amount for the first time in the reply brief is inappropriate and deprived JPM of the opportunity to present such evidence in its reply. Therefore, the Court will **DENY** summary judgment as to the period of time between March 23, 2020, and April 26, 2020.

The Government suggests that instead of a bench trial, the issue of the refund amount be determined by further "court-ordered briefing." (Doc. 52 at 28.) The Government does not cite a Federal Rule of Civil Procedure under which this briefing would take place. The Government essentially seeks a written bench trial, for which it cites no authority. But the time for briefing has expired with the dispositive motion deadline. Therefore, the Court **DENIES** the Government's request for "court-ordered briefing" instead of a bench trial.

C. **After April 26, 2020.**

JPM argues that it was subject to social distancing and masking orders that caused it to experience a full or partial shutdown after April 26, 2020. (Doc. 54 at 3.) The Government argues that for this period, there were no qualifying government orders and that JPM is resting its case solely on the Tennessee Pledge. (Doc. 52 at 19.) Furthermore, the Government argues that even if the documents JPM cites constitute orders, there was not a full or partial suspension of business operations due to those orders. The Court will first identify whether there were any orders, then turn to the causal chain.

1. **Whether any federal, state, or local guidance qualified as an order**

JPM references federal orders, the Tennessee Pledge, Tennessee Governor's Executive Order Nos. 17, 27, 29, 73, 77, 80, 81, 82, and 88, as well as directives from the City of Chattanooga, Hamilton County and the Hamilton County Health Department, OSHA, and the CDC. (Doc. 52-7 at 16; Doc. 1 at 4.) The Court will address the publications and directives that did affect

12

Case 1:24-cv-00357-CLC-MJD    Document 81    Filed 02/27/26    Page 12 of 20
PageID #: 1055

commerce, travel, and group meetings.[4] The Court finds that the federal orders, Tennessee Pledge, and all Executive Orders except for 29 and 73, as a matter of law, do not constitute orders. The Government concedes that Executive Order 73 is an order, and the Court finds that the Government has not met its summary judgment burden to show that Executive Order 29 is, as a matter of law, not an order.

First, JPM references federal orders in its complaint. (Doc. 1 at 4.) But it has not provided any federal orders nor has it cited to specific orders. In fact, Kane Weathers, the operations manager of a JPM Restaurant, noted that there were no federal orders that impacted JPM Restaurants and that "everything came either from the state or the – or the city." (Doc. 52-12 at 16.) And nowhere in JPM's response does it reference or provide any qualifying government orders from the federal government.

Second, the Tennessee Pledge, standing alone, as a matter of law, does not constitute an order. The cover of the pledge refers to itself as "guidance for businesses and other activities during the COVID-19 pandemic." (Doc. 52-8 at 1.) It explicitly states that "these guidelines do not replace or supersede any applicable state, federal, or other statutory or regulatory requirements or standards." (*Id.*) Furthermore, the language in the "restaurant" section of the document includes persuasive language, but not mandatory language; it repeatedly uses the term "should" and never refers to any of the information as a requirement.

But JPM argues that there were local directives that turned the Tennessee Pledge into requirements. "In Hamilton County, the Health Department issued directives and public health orders that governed business operations and that incorporated state protocols, such as Tennessee

---

[4] Some of these orders include masking mandates. But the Government is correct that any such masking mandates do not limit "commerce, travel, or group meetings." § 2301(c)(2)(A)(ii)(I). This is because indoor dining could, and did, happen even with masking mandates.

13

Pledge requirements, into mandatory operating conditions … simply put, JPM would face legal consequences if it chose to ignore the health department mandates imposed upon it." (Doc. 54 at 5.) JPM refers to one hundred fifty pages of documents that it claims have the full force and effect of law. (*Id.* at 3–4). The Government provided these documents to the Court in its reply. (Doc. 56.)

The Hamilton County directives, as a matter of law, do not constitute orders. Several of these documents only refer to City of Chattanooga employees and operations regarding City of Chattanooga facilities, which are not relevant to JPM's contentions. (Docs. 56-1, 56-2 at 1–82). There are also several Hamilton County Health Department press releases (Doc. 56-2 at 83–97) which JPM argues constitute orders. But they do not. Several of the Hamilton County Health press releases are merely reports on COVID-19 numbers and exposure. (Doc. 56-2 at 91–97, 85–86.) And others offer guidance to businesses in their re-opening. (*Id.* at 83–85, 87–90). But these documents do not use compulsory language, nor do they set out any consequences should businesses not comply. (*Id.*) These documents merely serve as guidance to Hamilton County businesses on safe operations during COVID-19. And the rest of these documents are the Tennessee Pledge, which the Court addressed above.

This leaves the executive orders. While the Government is correct that, as a matter of law, the Tennessee Pledge alone is not an order, and the Hamilton County directives do not turn it into an order, it has failed to demonstrated that, as a matter of law, Executive Order 29 is not an order. To be sure, this is a close question. But at the summary judgment stage, it is the job of the movant to show that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. And the Government has not carried that burden as to Executive Order 29. Executive Order 29, issued April 24, 2020, states that:

14

> Restaurants are expected to operate in accordance with, and to fulfill the spirit of, applicable operational guidance and measures adopted and/or issued by the Governor's Economic Recovery Group (ERG)… [i]f a restaurant does not operate in a safe manner, or if health outcomes demonstrate that a particular business or industry sector is unable to be operated in a sufficiently safe manner, the Governor and/or other applicable state official(s) may issue additional health and safety orders as may be appropriate under the circumstances."

(Doc. 52-6 at 2.) The Government concedes that the guidance referred to in this order was issued in the form of the Tennessee Pledge. (Doc. 52 at 19.) And while the language of the pledge itself may read like guidance, the executive order does not. The Executive Order says that restaurants are expected to operate in accordance with the Tennessee Pledge and contains another clause that grants the Governor authority to "issue additional health and safety orders as may be appropriate under the circumstances." (Doc. 52-6 at 2.) The "expectation" set forth in the order combined with the repercussions set out tilt the scales towards this being a compulsory requirement rather than a mere suggestion. For example, the order makes clear that if a restaurant fails to comply with the Tennessee Pledge, the Governor and state officials retained authority to issue additional health and safety orders in response to a failure to follow the Tennessee Pledge. The issuance of an additional order is the repercussion for not following the Tennessee Pledge. This suggests that there is a genuine dispute of material fact as to whether there was a qualifying order during the period in which Executive Order 29 was in effect. The Court though notes that in performing this analysis, it does not affirmatively find that Executive Order 29 turned the Tennessee Pledge into an order as a matter of law. Rather, Defendant has failed to carry its burden at this stage as to this order.

Whether the Tennessee Pledge was an order during the duration of Executive Order 29 cannot be resolved as a matter of law on these facts. But the same is not true regarding the executive orders after it went out of effect. As a matter of law, no other Executive Order made the

15

Tennessee Pledge mandatory. This compulsory language is not present in subsequent executive orders. While neither party provides all of the executive orders issued, the language in Executive Order 73, which is the next Executive Order provided, is different from Executive Order 29. It notes that "all venues, employers, businesses, and organizations are strongly encouraged and expected to operate in accordance with, and to fulfill the spirit of, applicable operational guidance issued by the Governor's Economic Recovery Group." (Doc. 52-11 at 1.) The inclusion of the phrase "strongly encouraged" where it did not exist before, as well as the removal of the paragraph granting the Governor authority to issue additional orders if the pledge was not followed shows that, at least as of Executive Order 73, following the Tennessee Pledge was no longer a requirement. (*Id.* at 1.)

However, as the Government admits, there is a provision of Executive Order 73 stating that "employers shall not require or allow employees with COVID-19 to work." (Doc. 52-11 at 16.) This, the Government acknowledges, functions as an order. (Doc. 52 at 25.)

Therefore, for the duration of Executive Order 29, the Government has not shown that as a matter of law, the Tennessee Pledge did not function as an order. And both parties agree that Executive Order 73 functioned as an order to the extent that it required employers to disallow COVID-affected employees from working. While the Court does not independently find that either document constituted an order, the Court will assume that these are orders for purposes of summary judgment and continue to the next part of the suspension analysis.

> 2. **Whether there was a partial or full suspension of operations due to either order**

The Court will now address whether, for the time period during which Executive Order 29 or Executive Order 73 were in effect, there was, as a matter of law, a full or partial suspension of

16

Case 1:24-cv-00357-CLC-MJD   Document 81   Filed 02/27/26   Page 16 of 20
PageID #: 1059

operations due to either Executive Order.  JPM argues that there were two types of closures: a reduction in hours and a decrease in revenue.  The Court will address each one by one.

JPM argues that it "reduced hours of operation substantially during the pandemic period, including reducing closing time from approximately 1:00 a.m. to as early as 10:00 p.m.," and such a reduction of operations meant that its "ability to operate its late-night service model, a substantial portion of its business, was materially impaired during the relevant time." (Doc. 54 at 7.)  JPM operations director Kane Weathers testified JPM "did not start expanding [its] hours back to the late night hours until almost 2022." (Doc. 52-12 at 13.)  JPM also argues that there were "partial-day operations and intermittent closures," and that there were days JPM could not open or could operate only partially because of "COVID-affected staffing." (*Id.*)  In response, the Government argues that these changes were not full or partial suspensions, and even if they were, the chain of causation between the labor shortages and the orders is too attenuated.  JPM argues that the Government's causal analysis is "unduly restrictive," and that to say there was no suspension "ignores record evidence of continued governmental constraints and their real-world operational impact on JPM." (Doc. 54 at 6.)

A closure is, by definition, a full or partial suspension of operations.  If a restaurant closes, the restaurant interrupted operations entirely and was not open to the public at all.  Therefore, the Court finds that a reduction in orders constituted a partial suspension because for a period of time during which the restaurant was typically open, it was closed and not operational.

The Court now will address whether their closures were due to any government orders.  JPM represents that it had to close its business roughly ten times over a five-month period, and that these closures were due to government orders "in a roundabout way because not having employees." (Doc. 52-7 at 20, 21.)  JPM represents that the reason for those ten closures and for

the variation in hours was because no one wanted to work and because they were concerned about youths congregating in ways that could be rowdy. (*Id.*) It argues the Government was paying unemployment insurance to people "that made them not want to work." (Doc. 52-7 at 21; Doc. 52-12 at 13), and that JPM also reduced hours due to worries about "what the kids do" when entering a bar, and how that might cause COVID-19 outbreaks. (Doc. 52-7 at 19.)

The causal chain between the orders and the reason for the labor shortage is too attenuated to meet the definition of "due to" because a lack of desire to work and pursue easier incentives is the intervening cause of the labor shortage. According to JPM, the labor shortage was because of the acts and desires of individual actors when it came to working incentives, not any governmental orders requiring those individuals to stop working. And JPM does not point to any suspension of operations that occurred because employees were required to be absent, such as because they were symptomatic or had COVID-19. (*See* Doc. 54.) Furthermore, as to JPM's second reason for cutting hours due to concerns of youths congregating, JPM has also not shown that their choice to cut hours was because of the government order; rather, it explicitly says that this choice was one made "out of pure practicality. When you have less people and you can't have them gather like they did, [they] just didn't have the business. It didn't make sense to stay open." (Doc. 52-7 at 18.) A voluntary decision made for business reasons does not mean that the choice was made because of a government order. *See Stenson Tamaddon LLC v. United States IRS*, No. CV-24-01123-PHX-SPL, 2025 U.S. Dist. LEXIS 117356, at *29 (D. Ariz. June 18, 2025) ("A business voluntarily suspending its own operations has not been suspended *due to orders from an appropriate governmental authority* but rather has suspended operations of its own volition.") (emphasis in original).

In addition to the closures, JPM also references several changes it made that affected revenue and the supply chain. Mr. Weathers testified "the biggest modification to Mike's Hole in the Wall was the requirement[] to move tables… that severely hampered our revenue and our business." (Doc. 52-12 at 16.) JPM attributes that change to following the Tennessee Pledge (*Id.*) And JPM also references mask mandates and supply-chain disruptions as contributing factors to this revenue disruption. (Doc. 54 at 2.) These, it argues, constitute a suspension of operations. (*Id.*)

A decrease in revenue and problems with the supply chain alone cannot constitute a "full or partial suspension." Congress, when drafting section 2301, also included a test to address the impacts of COVID on revenue: the gross receipts test. *See* § 2301(c)(2)(B). For the Court to allow revenue impact to be read into section 2301(c)(2)(A) would render the function of 2301(c)(2)(B) superfluous. *See United States ex rel. Polansky v. Exec. Health Res. Inc.*, 599 U.S. 419, 432 ("'Every clause and word of a statute' should have meaning.") (quoting *Montclair v. Ramsdell*, 107 U.S. 147 (1883)). Section 2301(c)(2)(A) was deliberately written with the term "suspension", which refers to situations where a restaurant fully or partially shuts down its operations; that term does not cover negative business impacts. And other sections of the CARES Act were explicitly written with broader relief in mind; in particular, there were provisions authorizing relief payments and broader tax refunds to respond to the broader economic losses JPM references. *See, e.g.* Pub. L. 116-136 § 1112(f), 134 Stat. 281, 310 (2020). Here, the Court finds that although there was a decrease in revenue and operating costs, such a decrease does not constitute a full or partial suspension of operations.

Therefore, even if the Court assumes without finding that the Tennessee Pledge during the efficacy of Executive Order 29 constituted an order, and the part of Executive Order 73 requiring

COVID-affected employees to stay home constituted an order, JPM did not experience a full or partial suspension of operations due to those orders. Therefore, the Court will **GRANT** summary judgment to the Government as to the period of time after April 26, 2020.

## IV. CONCLUSION

For the foregoing reasons, the Court will **GRANT IN PART** and **DENY IN PART** the Government's motion for summary judgment. The Court will **GRANT** the Government's motion as to the period of time after April 26, 2020, because JPM did not experience a partial or full suspension of operations due to a government order during that time. The Court will **DENY** the Government's motion as to the period of time between March 23, 2020, and April 26, 2020.

**AN APPROPRIATE ORDER WILL ENTER.**

**ENTER:**

/s/
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**